* * * * * * * * * * *
The Full Commission reviewed the prior Opinion and Award, based upon the record of the proceedings before the Deputy Commissioner and the briefs and oral argument before the Full Commission. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the Opinion and Award except for minor modifications.
 * * * * * * * * * * *
The Full Commission finds as facts and concludes as matters of law the following, which were entered into by the parties as:
 STIPULATIONS
1. That all parties are properly before the Industrial Commission and the Industrial Commission has jurisdiction over the matter.
2. That all parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
3. That all parties have been properly designated.
4. That plaintiff sustained a compensable injury on October 10, 2002.
5. That an employment relationship existed between plaintiff and defendant-employer during all relevant periods.
6. That plaintiff's average weekly wage is $378.00, yielding a compensation rate of $252.01.
7. The following documents were introduced into evidence as exhibits:
 a. Plaintiff's Medical Records;
 b. Plaintiff's Job Description;
 c. Defendant's Transitional Duty Policy;
 d. Letter from Defendant-Employer to Plaintiff Approving Transitional Duty Job Assignment dated September 27, 2004;
 e. Letter from Jeffrey Hargett to Defendant-Employer Regarding Transitional Duty Job Assignment, dated September 29, 2004;
 f. Letter from Defendant-Employer to Plaintiff Regarding Resignation dated October 6, 2004.
 * * * * * * * * * * * EVIDENTIARY MATTER
At the hearing before the Deputy Commissioner, the parties agreed to proceed on the basis of stipulated documents and thus called no witnesses. The Full Commission proceeded as such and takes judicial notice of all Industrial Commission forms and filings.
 * * * * * * * * * * *
Based upon all the competent evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was 36 years of age. Defendant employed plaintiff as a certified nursing assistant. Plaintiff's job duties included, but were not limited to, providing grooming and personal care services to residents, assisting with the feeding of residents, transferring, positioning and turning residents, performing restorative nursing services and performing restorative rehabilitation services. Pursuant to the written job description, plaintiff was frequently required to stand, walk, reach and occasionally required to sit, climb and/or balance. In addition, plaintiff was required to lift and/or transfer residents weighing between one hundred (100) and two hundred-fifty (250) pounds.
2. At the time of plaintiff's injury, she was a full-time employee and worked a minimum of 40 hours per week on the first shift, which required her to work between 7:00 a.m. and 3:00 p.m.
3. Plaintiff sustained an injury to her neck and left shoulder at work on October 10, 2002, while attempting to position a patient.
4. Defendant-employer accepted plaintiff's workers' compensation claim by filing a Form 60 Employer's Admission of Employee's Right to Compensation. Defendant-employer also provided plaintiff with light duty work.
5. On October 10, 2002, plaintiff presented to North State Medical Group, where she was diagnosed with left shoulder sprain and restricted to light duty with no lifting over 20 pounds, limited overhead activities, and no excessive use of the left arm. North State Medical Group provided follow-up care on October 22, 2002, and on November 11, 2002, plaintiff's light duty restrictions were continued.
6. On or about December 18, 2002, defendant-employer had become unable to accommodate plaintiff's restrictions. Consequently, defendant's began paying temporary total disability compensation at a compensation rate of $252.01 effective December 18, 2002 through May 18, 2005.
7. On January 6, 2003, plaintiff presented to Dr. Robert L. Liljeberg of Carolina Orthopaedic Specialists for further evaluation and treatment of left neck and left upper extremity symptoms. Dr. Liljeberg referred plaintiff for physical therapy and prescribed Skelaxin and Naproxyn. Dr. Liljeberg indicated that plaintiff could perform light duty work if available.
8. Plaintiff returned to Dr. Liljeberg on January 27, 2003, complaining of worsening left cervical paraspinal pain. Dr. Liljeberg recommended that plaintiff return to light duty work if her employer had it available. Dr. Liljeberg also prescribed a Tens unit.
9. Plaintiff continued with her physical therapy and on February 24, 2003, she returned to Dr. Liljeberg and reported improvement in her condition. Plaintiff stated to Dr. Liljeberg that she wanted to return to work possibly with a hospital in which she could perform a job that would require less lifting. Dr. Liljeberg recommended that plaintiff could perform work with no lifting more than 25 pounds.
10. On April 21, 2003, plaintiff returned the Tens unit and reported a left paraspinal cervical mass. Dr. Liljeberg ordered an MRI of plaintiff's cervical spine. Dr. Liljeberg noted in his medical records that the plaintiff is "very anxious to return to her job as a patient care assistant at the Bryan Center, but she wants to be sure she will not have a setback once she returns."
11. On May 7, 2003, plaintiff underwent the recommended MRI. On May 14, 2003, Dr. Liljeberg reported that plaintiff had completed physical therapy with no improvement in her condition. The MRI revealed left intervertebral foramen with a broad-based disk protrusion with mild L4 foraminal encroachment at C5-C6. Dr. Liljeberg referred plaintiff for an epidural steroid injection after which he recommended that plaintiff undergo a surgical evaluation.
12. Plaintiff presented to Dr. Alfred E. Geissele of Carolina Orthopaedic Specialists for a second opinion evaluation on June 13, 2003. Dr. Geissele diagnosed plaintiff with left cubital tunnel syndrome and possible cervical radiculitis. Dr. Geissele provided plaintiff with a cubital tunnel splint and recommended that plaintiff undergo a cervical epidural injection.
13. Plaintiff returned to Dr. Geissele on July 25, 2003 and he recommended that plaintiff undergo a closed magnet cervical MRI and a nerve conduction study of the left upper extremity. On August 5, 2003, plaintiff underwent the recommended MRI. Plaintiff also underwent nerve conduction studies of her left extremity on August 19, 2003, which revealed borderline slowing across the left carpal tunnel but no evidence of significant ulnar nerve entrapment.
14. On August 26, 2003, Dr. Geissele concluded that plaintiff's symptoms were related to the disk protrusion at her cervical spine and recommended that plaintiff undergo a discogram. On February 9, 2004, plaintiff underwent the recommended procedure that revealed minimal disk bulge and disk desiccation at the C6-7 level.
15. On February 12, 2004, plaintiff presented to Dr. Geissele to discuss surgery as a treatment option and plaintiff agreed to proceed with surgery. On July 9, 2004, plaintiff underwent an anterior cervical fusion at C6-7.
16. Dr. Geissele provided follow-up care after plaintiff's fusion surgery and on August 18, 2004, Dr. Geissele released plaintiff to return to work four hours a day with no lifting more than 10 pounds and with position changes as needed. Dr. Geissele predicted that within three to six months postoperative, plaintiff would likely be able to return to work at full duty as a nursing assistant.
17. Prior to plaintiff's injury, defendant-employer had a transitional return to work policy, which "provided a temporary transitional work program for employees who are disabled from performing regular job duties due to occupational injury or illness or where otherwise required by law." According to the transitional duty policy, job modifications would be made to the transitional job that would be consistent with the injured employee's abilities. The work assignments were temporary.
18. Defendant's transitional return to work policy further dictated that an injured employee's supervisor complete a transitional duty job description, which took into account the authorized treating physician's job restrictions, and forward the job description to the authorized treating physician for approval. The policy further provided that an employee's refusal to return to work in the transitional job would constitute his or her self-termination/voluntary resignation.
19. In a progress report for the period from August 25, 2004 through September 22, 2004, the nurse case manager assigned to the claim indicated that she had provided plaintiff's counsel with a copy of a light duty job description and that he had discussed it with plaintiff. The nurse case manager reported that plaintiff felt she could perform the job but was concerned about working from 3:00 p.m. to 7:00 p.m.
20. On September 22, 2004, the job description was forwarded to Dr. Geissele by the nurse case manager and he approved the transitional duty job assignment which included taking and recording vital signs, feeding residents, and grooming two named residents by cleaning their faces, shaving their faces, and cleaning their nails.
21. By letter dated September 27, 2004, Lydia A. Minton, an administrator for defendant-employer, offered plaintiff transitional employment beginning October 1, 2004.
22. The modified or transitional job duty differed significantly from plaintiff's CNA position in the following aspects:
 a. Lifting and carrying in the transitional job description was limited to not more than ten (10) pounds;
 b. Plaintiff's employment prior to her injury was full-time employment, whereas the transitional job duty description only provided for four hours of employment per day;
 c. Plaintiff's job prior to her injury required her to sit and stand for prolonged periods of time, whereas the transitional job duty required that she be allowed to change positions as needed; and
 d. The transitional job only required plaintiff to perform approximately four out of the 29 tasks comprising the job description of Certified Nursing Assistant.
23. In a letter dated September 29, 2004, plaintiff's counsel communicated with defendant that the proposed job was a make-work position and also that plaintiff could not accept it due to the change in plaintiff's working hours. Prior to plaintiff's admittedly compensable injury by accident, she worked from 7:00 a.m. to 3:00 p.m. and the working hours in the proposed job were from 3:00 p.m. to 7:00 p.m., thus prompting childcare concerns. Plaintiff did not return to work in the modified or transitional position.
24. On October 5, 2004, plaintiff reported back to Dr. Geissele complaining of pain and inflammation and discomfort in the left-sided neck, trapezius as well as down the left arm. Plaintiff reported feeling "no better." Dr. Geissele recommended that plaintiff undergo a CT scan to determine whether the fusion was solid and indicated that in light of plaintiff's continuing high degree of complaints, a functional capacity evaluation might be needed. Dr. Geissele further stated that once he could determine that plaintiff's fusion was solid, she might be at maximum medical improvement and ready for a rating and release.
25. As plaintiff did not return to the transitional job, she was deemed to have voluntarily resigned pursuant to defendant's policy by letter dated October 6, 2004.
26. On or about October 7, 2004, defendants filed a Form 24 seeking to terminate or suspend plaintiff's temporary total disability compensation based on plaintiff's refusal to return to light duty work. An informal telephonic hearing was held on the Form 24 on October 22, 2004. By Administrative Decision and Order filed November 10, 2004, Special Deputy Commissioner Robert J. Harris disapproved the Form 24.
27. On November 10, 2004, plaintiff presented to Dr. Geissele again complaining of continuing neck pain and pain in the base of her head. Dr. Geiselle determined that plaintiff's fusion was not solid at the top and recommended that she give the fusion more time to heal. Dr. Geissele released plaintiff to return to work eight hours a day with no lifting greater than 10 pounds and frequent position changes.
28. On January 11, 2005, plaintiff again reported ongoing pain and Dr. Geissele referred her to pain management for injection of the greater occipital nerve. On February 3, 2005, plaintiff underwent a left greater occipital nerve block.
29. On March 2, 2005, Dr. Geissele noted that plaintiff would "hopefully be at or nearly at maximum medical improvement at the time of her next visit." At that visit, Dr. Geissele released plaintiff to return to work without restrictions. On April 11, 2005, plaintiff returned to work for another employer earning fewer wages than she was earning while employed with defendant-employer.
30. After a thorough and complete review of the record, the Full Commission finds that plaintiff was truthful in her complaints of pain and in her inability to seek other employment until she was fully released by Dr. Geissele on March 2, 2005. This is evidenced by the fact that she located employment with another employer on her own within five weeks after such release.
31. The Full Commission finds that when defendants offered plaintiff the transitional job, she had continuing and ongoing neck and shoulder pain and was still under Dr. Geiselle's care and temporary, light duty restrictions. Moreover, shortly after defendant's offer of transitional employment, Dr. Geiselle determined that plaintiff's fusion was not solid at the top and recommended that she give the fusion more time to heal.
32. The transitional job that defendant-employer offered was only temporary, did not include any of the rehabilitation/restorative nursing duties of plaintiff's CNA job and was not a regularly filled position. Furthermore, there is no evidence to suggest that defendants contemplated or communicated any wage amount to plaintiff for this transitional job, and the hours being different, presented childcare problems for plaintiff.
33. The Full Commission finds that there is no evidence of record that the modified/transitional job defendants offered to plaintiff was one that would also be available with other employers at a comparable wage.
34. Notwithstanding the fact that Dr. Geissele approved the transitional job for plaintiff, the competent evidence of record establishes that defendant's transitional job offer made to plaintiff constituted "make-work" in that it was a job that was not readily available in the competitive marketplace.
35. Moreover, the Full Commission finds, according to plaintiff's credible testimony, that plaintiff experienced ongoing pain related to her admittedly compensable injury by accident from the date of injury and continuing until her full and complete release to return to work on March 2, 2005, which prohibited her from seeking other employment when she was terminated by defendant-employer for refusing their make-work job offer. This is evidenced by the fact that shortly after defendant-employer's offer of transitional employment, Dr. Geiselle determined that plaintiff's fusion was not solid at the top and recommended that she give the fusion more time to heal.
36. The Full Commission finds that there is insufficient evidence in the record to prove by the greater weight that defendant-employer offered plaintiff suitable employment or that plaintiff was capable of earning her pre-injury wages in the same or any other employment until she located employment on her own with another employer within five weeks after the full and complete release from Dr. Geissele with no restrictions.
37. The plaintiff returned to work for another employer on April 11, 2005, earning fewer wages than her pre-injury wages with defendant-employer. Plaintiff is therefore entitled to receive temporary partial disability compensation.
 * * * * * * * * * * *
Based upon the foregoing Stipulations and Findings of Fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. On October 10, 2002, plaintiff sustained a compensable injury by accident to her neck and left shoulder arising out of and in the course of her employment with defendant-employer. N.C. Gen. Stat. § 97-2(6)
2. Although defendants offered transitional light duty employment to plaintiff, it was make work and thus not suitable employment. Moreover, plaintiff continued to be in pain as evidenced by her testimony and the medical evidence. Consequently, defendant's offer of transitional light duty employment was not suitable and plaintiff's refusal to accept this employment was justified. N.C. Gen. Stat. § 97-32.
3. The purpose of N.C. Gen. Stat. § 97-32 is to guard against the possibility that an injured employee may refuse to work when, in fact, he is able to work and earn wages, and thus increase or attempt to increase the amount of his compensation. Branham v. Denny Roll PanelCo., 223 N.C. 233, 25 S.E.2d 865 (1943). Plaintiff's credibility is evidenced by the fact that once Dr. Geissele released plaintiff to return to her regular duties on March 2, 2005, she did so on a full-time basis for another employer just five weeks later, on April 11, 2005.
4. Plaintiff is entitled to have defendant pay ongoing compensation for temporary total disability at the rate of $252.01 per week beginning December 18, 2002, and continuing through April 10, 2005. N.C. Gen. Stat. § 97-29.
5. As a result of plaintiff's admittedly compensable injury by accident, plaintiff is entitled to temporary partial disability compensation at a rate of two-thirds of the difference between plaintiff's pre-injury average weekly wage of $378.00 and her post-injury average weekly wage continuing until such time as plaintiff's earnings meet or exceed her pre-injury wage, but not to exceed 300 weeks from the date of injury. Based upon company records, counsel for both parties shall determine the exact time periods. N.C. Gen. Stat. § 97-30.
6. As a result of plaintiff's admittedly compensable injury by accident, plaintiff is entitled to have defendants pay for all of her medical expenses incurred or to be incurred, as a result of her admittedly compensable injury by accident, for so long as such evaluations, examinations and treatments may reasonably be requested to effect a cure, give relief and will tend to lessen plaintiff's disability. N.C. Gen. Stat. § 97-25 and 97-2(19).
 * * * * * * * * * * *
Based upon the foregoing Findings of Fact and Conclusions of Law, the Full Commission makes the following:
 AWARD
1. Subject to a reasonable attorney's fee hereinafter approved, the defendants shall pay plaintiff temporary total disability at the rate of $252.01 per week beginning December 18, 2002, and continuing through April 10, 2005. Compensation due which has accrued shall be paid to plaintiff in a lump sum, subject to the attorney's fees hereinafter provided.
2. Subject to a reasonable attorney's fee hereinafter approved, the defendants shall pay to plaintiff temporary partial disability compensation at a rate of two-thirds of the difference between plaintiff's pre-injury average weekly wage of $378.00 and her post-injury average weekly wage continuing until such time as plaintiff's earnings meet or exceed her pre-injury wage, but not to exceed 300 weeks from the date of injury. Based upon company records, counsel for both parties shall determine the exact time periods. Compensation due which has accrued shall be paid to plaintiff in a lump sum, subject to the attorney's fees hereinafter provided.
3. Defendants shall pay for all medical expenses incurred or to be incurred by plaintiff as a result of her admittedly compensable injury by accident, for so long as such evaluations, examinations and treatments may reasonably be requested to effect a cure, give relief and will tend to lessen plaintiff's disability.
4. A reasonable attorney's fee of 25% of the compensation due plaintiff under Paragraphs 1 and 2 of this Award shall be deducted from sums due plaintiff and paid directly to plaintiff's counsel.
5. Defendants are entitled to a credit resulting from overpayment, if any, of temporary total disability compensation.
6. Defendants shall pay the costs.
This the ___ day of January 2007.
 S/______________ PAMELA T. YOUNG COMMISSIONER
CONCURRING:
 S/______________ THOMAS J. BOLCH COMMISSIONER
 S/______________ LAURA KRANIFELD MAVRETIC COMMISSIONER